IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

# 13-80076-CR-MARRA/MATTHEWMAN

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 12-CR-30221-MJR |
| ) | |
| GARRY A. BROWN, ) | |
| ) | |
| Defendant. ) | |

## CONSENT TO TRANSFER OF CASE
## FOR PLEA AND SENTENCE UNDER RULE 20

Having been informed that an indictment is pending in the above designated cause, I wish to plead guilty in the United States District Court in the Southern District of Florida, where I reside or am present, to the offense charged in the indictment, consent to the disposition of the case in that District, and to waive trial in both districts.

X _____
GARRY A. BROWN

_____
RODNEY HOLMES, Counsel for Defendant

_____
KATHERINE L. LEWIS
Assistant U.S. Attorney
Southern District of Illinois

Approved:

_____   _____
WIFREDO A. FERRER           STEPHEN R. WIGGINTON
United States Attorney       United States Attorney
Southern District of Florida Southern District of Illinois

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**FILED**

JUL 1 9 2012

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Criminal No. 12-30221-MJR |
| GARRY A. BROWN, | ) |
| | ) Title 18 |
| Defendant. | ) United States Code, Section 1349 |
| | ) |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### I. Introductory Statement

1. Between on or about the 15th day of October, 2007, through at least January, 2010, in St. Clair, Madison, Bond, Clark, Calhoun, Clinton, Crawford, Cumberland, Edwards, Effingham, Fayette, Gallatin, Green, Jackson, Jefferson, Johnson, Lawrence, Marion, Monroe, Perry, Pike, Pulaski, Randolph, Richland, Saline, Wabash, Washington and Williamson Counties, within the Southern District of Illinois and elsewhere, **GARRY A. BROWN,** Jennifer Kirk, and others known and unknown, doing business as Universal Marketing Solutions ("UMS") and Creative Vacation Solutions ("CVS"), conducted a telemarketing timeshare resale scheme targeting timeshare owners throughout the United States and Canada. UMS and CVS falsely represented that they had found buyers for the consumers' timeshare interests and solicited fees of up to several thousand dollars from each consumer in purported pre-paid closing costs and related expenses. The purported sales did not occur, closings were not scheduled as

1

was often represented, and, in fact, UMS and CVS did not successfully sell any consumer's timeshare interest. UMS and CVS failed to devote substantial resources to marketing their clients' timeshare interest and simply pocketed the purported closing costs, with about a third going to the individual telemarketers who sold the timeshare resale services to the consumer and the balance kept by the owners of the telemarketing company.

2. Between October 5, 2007 and approximately December 1, 2009, UMS and CVS collected approximately $30 million and victimized approximately 22,219 consumers in all fifty states, the District of Columbia and Puerto Rico; all ten Canadian provinces and the Northwest Territory of Canada. UMS and CVS victimized at least 54 consumers in at least twenty eight (28) of the thirty eight (38) counties comprising the Southern District of Illinois.

## II. Participants

3. Universal Marketing Solutions ("UMS") was the initial name under which the timeshare resale scheme operated. UMS was a registered fictitious name of Hicks, Inc, which was incorporated in 2006 and was located in Palm Beach County, Florida. The owners of Hicks, Incorporated, were Matthew Hicks, deceased, who was the boyfriend of Jennifer Kirk, and Jennifer Kirk. Hicks was the President and Jennifer Kirk was the Vice President. Hicks, Inc, was dissolved in 2009.

4. Creative Vacation Solutions ("CVS") became the business name under which the scheme operated after Universal Marketing Solutions had lost or was in the process of losing its credit card merchant accounts. Creative Vacation Solutions was a Florida Corporation based in Palm Beach County, Florida and formed in 2008 ostensibly by S.K., its ostensible owner, the

2

brother of Jennifer Kirk. In fact, the company was owned and operated by Jennifer Kirk.

5. UMS and CVS had several sales offices located in south Florida including offices at West Palm Beach, Belvedere, Boca Raton, Okeechobee, Green Acres and Lake Worth. Some of these offices resembled franchise operations in that they were owned and operated by others, but used the same business name, the same sales pitches and collected money through common credit card merchant accounts.

6. **BROWN** worked at Universal Marketing Solutions from on or about July 22, 2008 to on or about February 16, 2009. **BROWN** was both an opener and a closer. **BROWN** worked primarily in the main office and during the period of his employment he was responsible for approximately 237 sales aggregating $399,075.44.

### III. The Scheme

7. Universal Marketing Solutions and Creative Vacation Solutions were names under which defendant and others operated the timeshare resale scam. Both engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest.[1]

8. A telemarketer referred to as an "opener" would place a cold call to a timeshare owner from lead lists obtained from list brokers. The opener would ask if the timeshare owner had an interest in selling her timeshare unit. If such an interest was expressed, then the opener would transfer the call to a "closer." The "closer," frequently described to the consumer as the

---

[1] As used in this information, "timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time. What constitutes a "timeshare" depends upon the law of the state in which the real estate is located.

3

"inventory manager," would then take over the call from the opener. Sometimes, before the closer took over the phone call from the customer, the opener, closer and other telemarketers would discuss the perceived level of desperation of the prospect to sell their timeshare unit. Fees for the illusory services being sold by UMS and CVS would then be jacked up to correspond with the apparent level of desperation. Once the "inventory manager" got on the phone with the prospect, he would tell the prospect that UMS and CVS had one or more "buyers" or "offers" for units in the timeshare resort where the prospects unit was located. Once the customer paid a generous fee of up to several thousand dollars for closing related expenses, the "inventory manager" said that he could "attach" one of the "buyers" or "offers" to the customer's timeshare unit. Telemarketers typically provided a specific closing date sixty to ninety days out and told clients that the closing related expenses they would have to pay would be refunded at closing. Telemarketers then processed charges against the consumers' credit cards and pocketed the money.

9. In general, the closing date given to customers was made up by the telemarketer. The made up closing date needed to be at least 60 to 90 days from the date of the call. The purpose of the delayed closing date was to postpone when customers would call their credit card companies or banks to complain that they had been defrauded, an inevitable result from their supposed "closing" dates having come and gone without the client receiving the sales proceeds check they had been promised. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the company's merchant account and thus jeopardize the ability of the company to process bank card transactions and get paid.

4

10. After persuading a consumer to purchase UMS and CVS services, the telemarketer would then complete an internal sales form with the owner's information, including information on the owner's timeshare interest and asking price, and then transfer the file to a "quality assurance" employee. The "quality assurance" employee would then place a telephone call to the consumer and make a recording of that part of the call where the consumer gave their oral consent to a charge to the consumer's credit card, debit card, or ACH debit on the consumer's bank account. During the *unrecorded* portion of the call made to CVS customers, many consumers were read the following:

> First, I will be discussing with you our marketing practices and how we have gotten the offer on your unit and I'll also be discussing with you, *that although we do have an offer of $\_\_\_\_*, we cannot legally attach one specific buyer to your unit until we have your free and clear deed and title as well as your signed contract and seller certification back in house. (Emphasis supplied)

11. This purported "quality assurance" script contained a blank for the telemarketer to insert a dollar amount for the purported "offer" that CVS had supposedly received on that consumer's timeshare. UMS would generally ask the timeshare owners what they had paid for their units. The illusory offers for timeshares in that resort would then correspond to an amount roughly twenty five percent higher than a timeshare owner had paid for it. CVS often filled in the offer amount with the consumer's *asking price* which had been just written by the telemarketer on the form given to the "quality assurance" employee. After telling the consumer that CVS had received an offer on the consumer's timeshare exceeding or approximating their asking price, the "quality assurance" employee turned on the tape recorder and recorded an acknowledgment by the consumer that the bank card number and expiration date, or bank account information and routing code was correct and that the consumer had agreed to the

5

transaction. The recorded part of the script contained an acknowledgment by the consumer that they were "authorizing" the company to sell the unit for a particular "sale price," a more ambiguous statement that fell short of the representation that the company had actually received an offer in the amount of the asking price (or a price that exceeded the original purchase price), a representation that had been previously made only moments before in the unrecorded part.

    12.    During the recorded part of the "quality assurance" verification, clients were asked to acknowledge that they had not been told that there was a specific buyer for the property. Clients were coached as to how to respond to that question. They were led to believe that, while there were firm offers and in some cases multiple buyers for their unit, that the company could not "legally attach" the offer or buyer to the property until they had a signed contract. After all, according to this logic, the company could not sell a timeshare unit *until* it had a signed contract from the client. It was when they signed their contract (and paid their fees) that the company could "attach" a specific buyer or offer to their timeshare unit. Thus, it would not have seemed inconsistent for a client to acknowledge during the recording that they had *not* been promised that there was a buyer when in fact that is exactly what they had been promised. If a client did not follow the script, the call would be terminated, the client re-coached and a new recording begun until the client answered the questions in strict conformance with the company script. Thus, when the customer later complained that they had been promised a closing, UMS and CVS could then retrieve the recording as purported evidence to the client, to the Better Business Bureau, to regulators, and to law enforcement officials, that the company had promised no such thing.

13. After the customer paid the ostensible closing costs by bank card or ACH debit, CVS would send the customer a contract to sign. Rather than a contract for the sale of the property as had been promised, CVSs contract instead only obligated CVS to provide advertising and marketing services.

14. As UMS and CVS's unrecorded sales pitch, "quality assurance" procedures and written contracts were constructed, UMS and CVS could claim that marketing and advertising was all that UMS and CVS had ever agreed to provide and that any impression that the consumer may have formed that UMS and CVS had a concrete offer for the customer's unit was a "misunderstanding" on the customer's part.

15. Despite collecting approximately $29,320,662.08 from consumers for timeshare resale services, UMS and CVS were not instrumental in selling a single timeshare. While occasionally desperate timeshare owners expressed interest in abandoning their timeshare interest because of recurring annual fees, and Kirk personally would purchase timeshare units at distressed fire sale prices, there were substantially no sales at or any where near the full asking price of the seller. UMS and CVS made no substantial effort to either market or advertise any customer's timeshare interest other than a simple listing on a website which was made at relatively nominal expense. UMS and CVS made little effort to promote their website and a listing on the website was of no practical value to its customers.

16. After the promised closing dates came and went without a closing actually taking place, many customers called UMS and CVS to ask about the status of the expected closing. UMS and CVS had telemarketers to respond to these inquiries. The goal of their customer service operation was to keep clients from reporting the credit card transaction they had entered

7

into with UMS or CVS as fraudulent to their credit card companies and initiating a charge back against the company's merchant accounts into which receipts from the victims' credit card transactions were deposited. In general, victims were first told that the offer on the victim's timeshare was firm. In subsequent calls to customer service they were then given a number of excuses as to why the closing had not occurred, including the fact that the "maintenance and title report" were still in process, that the buyers were in the process of getting financing, that the buyers were having difficulty getting financing, and that the buyers' financing had fallen through. These statements were false and fraudulent in that UMS and CVS had no buyers, no offers and no interested parties. UMS and CVS maintained a spreadsheet which kept track of the lies being given to their clients in order to avoid providing the same lie twice to the same victim.

17. As complaints against UMS and CVS escalated, and it became apparent that it would be increasingly difficult to do business under the increasingly tarnished name of the respective company, their telemarketers reloaded their existing customers with additional credit card charges in a practice known internally as both "burning down the house" and "doing rentals."

18. "Doing rentals" meant that the telemarketer would recontact customers who had purchased the illusory service and who were expecting imminent closings on their property. The customers were told that the supposed buyers were interested in purchasing additional time in the seller's timeshare development. When the customer reported that she didn't have additional time to sell, the telemarketer told the customer that UMS or CVS had additional time that could be sold to the "buyer" provided that the customer pay for "guest passes," or other fees. Through this bogus mechanism, which was almost always successful, UMS and CVS could collect

8

additional credit card charges on the victim's credit card account. In truth and in fact, the so called "guest passes" and other fees were a complete fabrication and this purported expense was likewise a total scam.

19. For a very brief period of time, CVS operated somewhat legitimately. For between a few days to approximately a couple of weeks or more, CVS pitched marketing and advertising services, rather than falsely represent to victims that it had firm offers or buyers for their timeshare interest. Their business essentially evaporated once telemarketers were prohibited from lying to the consumer . They found that relatively few timeshare owners were interested in paying to simply advertise and market their property. They learned that there may be those willing to pay one or two hundred dollars or so to do so, but fewer still are willing to pay thousands of dollars to simply place a listing of the consumer's timeshare interest on a company's website. When CVS attempted to go legitimate, income to individual telemarketers tanked.

20. Telemarketers who were "openers" and "closers" split about a third of whatever fees they could bilk from an individual customer. Telemarketers who were very successful at UMS and CVS were not so because they were particularly good salesmen. They were successful and made lots of money because they were especially good liars.

21. The established, proven and highly successful sales pitch that was used by UMS and CVS telemarketers contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

    A. UMS and CVS agents falsely represented that their companies had received an offer on the customer's time share. This claim was sometimes embellished by

9

individual telemarketers to include *multiple* offers on the property. In addition, many consumers were also told that the specific offer that had been received was a "binding" contract and that the purported purchaser "could not back out of it."

        B.    UMS and CVS agents falsely represented that a closing was scheduled on the property often thirty to ninety days hence.

        C.    UMS and CVS agents falsely represented that the fees were for deed and title searches, maintenance profiles, deed preparation, title transfer and for similar expenses.

        D.    UMS and CVS agents variously falsely represented to clients who called customer service that UMS and CVS indeed had an offer or buyer for the property and various made up excuses as to why the closing had not taken place on their timeshare units as promised and represented.

        22.    The representations made in the sales pitch used by UMS and CVS were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer. The fees were not being used for closing costs, but were being purloined to enrich the telemarketers and their bosses and pay for the continuing expenses associated with the scam. Only a relatively small amount was going to the cost of listing the property on UMS's and CVSs website, if indeed the consumer's property was even listed there.

        23.    The sales practices of UMS and CVS were false and misleading and both were businesses permeated with fraud in an industry pervaded by deceit.

        24.    Defendant utilized sales scripts that in the circumstances in which they were used created an appearance which was false and deceptive and calculated to induce a false belief as to

the true facts.

25. In connection with the transactions described in this Indictment, defendant engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over victims located in the Southern District of Illinois and elsewhere throughout the United States and Canada.

## IV - Conspiracy
## 18 U.S.C. §1349

26. From on or about the 15th day of October 2007 and continuing through at least January, 2010 in the counties of St. Clair, Madison, Bond, Clark, Calhoun, Clinton, Crawford, Cumberland, Edwards, Effingham, Fayette, Gallatin, Green, Jackson, Jefferson, Johnson, Lawrence, Marion, Monroe, Perry, Pike, Pulaski, Randolph, Richland, Saline, Wabash, Washington and Williamson Counties, within the Southern District of Illinois and elsewhere,

**GARRY A. BROWN**

defendant herein, together with Jennifer Kirk and various managers of the telemarketing call centers operating under the name Universal Marketing Solutions and Creative Vacation Solutions, and others both known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate and agree among themselves and each other to commit certain offenses against the United States as follows:

    A. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by

11

the United States Postal Service and by commercial interstate carrier, mail matter to and from residents of the United States, including residents of the Southern District of Illinois, to and from the offices of UMS and CVS in the State of Florida, in violation of Title 18, United States Code, Section 1341.

    B. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be transmitted by means of wire or radio communication in interstate and foreign commerce, interstate telephone calls, credit card transactions, electronic fund transfers, and signs and signals, to and from the offices of UMS and CVS in the State of Florida, in violation of Title 18, United States Code, Section 1343.

  27. In furtherance of and as a foreseeable consequence of the conspiracy, UMS and CVS and its telemarketers caused contracts and other documents to be transmitted by U.S. Mail or by interstate commercial carrier to the Southern District of Illinois.

  28. In furtherance of and as a foreseeable consequence of the conspiracy, UMS and CVS and its telemarketers caused interstate telephone calls to be made to the Southern District of Illinois.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326(1).



**FOREPERSON**

_____
STEPHEN R. WIGGINTON
United States Attorney

_____
BRUCE E. REPPERT
KATHERINE LEWIS
Assistant United States Attorneys

13

BAK,CLOSED

# U.S. District Court
## Southern District of Illinois (East St. Louis)
## CRIMINAL DOCKET FOR CASE #: 3:12-cr-30221-MJR-1

| | |
|---|---|
| Case title: USA v. Brown | Date Filed: 07/19/2012 |
| | Date Terminated: 03/21/2013 |

Assigned to: Judge Michael J. Reagan

**Defendant (1)**

| | | |
|---|---|---|
| **Garry A Brown**<br>*TERMINATED: 03/21/2013* | represented by | **Rodney H. Holmes**<br>The Holmes Firm<br>P.O. Box 771098<br>St. Louis, MO 63177-1098<br>314-249-8713<br>Fax: 618-825-0293<br>Email: Rdnyholmes@aol.com<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1349-Conspiracy<br>(1) | Case transferred to Southern District of Florida pursuant to Federal Rule of Criminal Procedure 20 |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Bruce E. Reppert** |

Assistant U.S. Attorney - Fairview Heights
9 Executive Drive
Suite 300
Fairview Heights, IL 62208
618-628-3700
Email: Bruce.Reppert@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Katherine L Lewis**
U.S. Attorney - Fairview Heights
9 Executive Drive
Suite 300
Fairview Heights, IL 62208
618-628-3770
Email: katherine.lewis@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/19/2012 | 1 | INDICTMENT as to Garry A Brown (1) count 1. (trb) (Entered: 07/20/2012) |
| 07/19/2012 | 4 | SUMMONS Issued in case as to Garry A Brown Arraignment set for 8/7/2012 02:00 PM in East St. Louis Courthouse before Magistrate Judge Clifford J. Proud. (trb) (Entered: 07/20/2012) |
| 07/19/2012 |   | Location start LO as to Garry A Brown (trb) (Entered: 07/20/2012) |
| 07/23/2012 | 5 | MOTION to Designate Case a Multiple Victim Case by USA as to Garry A Brown. (Reppert, Bruce) (Entered: 07/23/2012) |
| 07/27/2012 | 6 | ORDER as to Garry A Brown, GRANTING 5 MOTION to Designate Case a Multiple Victim Case filed by USA. Signed by Judge Michael J. Reagan on 7/27/2012. (mmr) (Entered: 07/27/2012) |
| 08/01/2012 | 7 | Summons Returned Executed on 7/26/12 as to Garry A Brown (cekf) (Entered: 08/01/2012) |
| 08/06/2012 | 8 | NOTICE OF CANCELLATION OF HEARING: Arraignment set for 8/7/2012 02:00 PM in East St. Louis Courthouse before Magistrate Judge Clifford J. Proud is hereby CANCELLED and will be reset under separate cover. (jmp) THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 08/06/2012) |
| 08/30/2012 | 9 | NOTICE OF HEARING as to Garry A. Brown. Initial Appearance and Arraignment set for 9/24/2012 at 10:30 AM in East St. Louis Courthouse before Magistrate Judge Donald G. Wilkerson. (jmp)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 08/30/2012) |
| 08/30/2012 | 10 | Letter to Garry A. Brown advising of process and procedure the Court will use to conduct the Initial Appearance and Arraignment via video conferencing. |

| | | |
|---|---|---|
| | | (jmp) (Entered: 08/30/2012) |
| 09/14/2012 | 11 | CJA 20 as to Garry A Brown: Appointment of Attorney Rodney H. Holmes for Garry A Brown. Signed by Magistrate Judge Donald G. Wilkerson on 9/6/12. (cekf) (Entered: 09/14/2012) |
| 09/24/2012 | 12 | Minute Entry for proceedings held before Magistrate Judge Donald G. Wilkerson:Garry A. Brown appeared via video from the U.S. District Court in the Southern District of Florida for an Initial Appearance and Arraignment on 9/24/2012 as to Count 1. Attorney Rodney Holmes appeared in person at the U.S. District Court in Southern Illinois on behalf of defndant. Not guilty plea entered. Jury Trial set for 11/26/2012 at 9:00 AM in East St. Louis Courthouse before Judge Michael J. Reagan. (Court Reporter Laura Blatz.) (jmp) (Entered: 09/25/2012) |
| 09/24/2012 | 13 | ORDER REGARDING PRETRIAL DISCOVERY AND MOTION PRACTICE as to Garry A. Brown. Signed by Magistrate Judge Donald G. Wilkerson on 9/24/2012. (jmp) (Entered: 09/25/2012) |
| 09/24/2012 | 14 | ORDER Setting Conditions of Release as to Garry A. Brown. Signed by Magistrate Judge Donald G. Wilkerson on 9/24/2012. (jmp) (Entered: 09/25/2012) |
| 09/24/2012 | 15 | APPEARANCE BOND entered in the amount of $10,000.00 unsecured as to Garry A. Brown. (jmp) (Entered: 09/25/2012) |
| 11/13/2012 | 16 | First MOTION to Continue *Trial* by Garry A Brown. (Holmes, Rodney) (Entered: 11/13/2012) |
| 11/15/2012 | 17 | ORDER TO CONTINUE - Ends of Justice, GRANTING 16 First MOTION to Continue *Trial* filed by Garry A Brown. By motion filed November 13, 2012, Defendant Garry A. Brown moves to continue his trial. Defendant Brown's motion explains that he and the Government are exploring the possible transfer of this case to Florida for a combined plea, but more time is required than the current November 26, 2012, trial setting will allow. The Government does not object to the requested continuance of the trial setting. Accordingly, the Court FINDS that the ends of justice served by granting the continuance outweigh the best interest of the public and Defendant in a speedy trial. As a result, the Court GRANTS Defendant Brown's motion, and CONTINUES the Jury Trial to 9:00 a.m. on Monday, January 7, 2013, in the East St. Louis Courthouse before Judge Michael J. Reagan. The period of delay resulting from this continuance is excludable and SHALL be excluded under the Speedy Trial Act, 18 U.S.C. 3161(h). IT IS SO ORDERED. Signed by Judge Michael J. Reagan on 11/15/2012. (mmr)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 11/15/2012) |
| 01/02/2013 | 18 | Second MOTION to Continue *Trial* by Garry A Brown. (Holmes, Rodney) (Entered: 01/02/2013) |
| 01/03/2013 | 19 | ORDER TO CONTINUE - Ends of Justice, GRANTING 18 Second MOTION to Continue *Trial* filed by Garry A. Brown. By motion filed January 2, 2013, Defendant Garry A. Brown moves to continue his trial. Defendant Brown's motion explains that he and the Government are still pursuing the transfer of |

|            |    |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
|------------|----|-----|
|            |    | this case to Florida for a plea pursuant to Federal Rule of Criminal Procedure 20, therefore more time is required than the current January 7, 2013, trial setting will allow. The Government does not object to the requested continuance of the trial setting. Accordingly, the Court FINDS that the ends of justice served by granting the continuance outweigh the best interest of the public and Defendant in a speedy trial. As a result, the Court GRANTS Defendant Brown's motion, and CONTINUES the Jury Trial to 9:00 a.m. on Monday, April 1, 2013, in the East St. Louis Courthouse before Judge Michael J. Reagan. The period of delay resulting from this continuance is excludable and SHALL be excluded under the Speedy Trial Act, 18 U.S.C. 3161(h). IT IS SO ORDERED. Signed by Judge Michael J. Reagan on 1/3/2013. (mmr)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/03/2013) |
| 03/21/2013 | 20 | CONSENT TO TRANSFER JURISDICTION (Rule 20) to Southern District of Florida Counts closed as to Garry A Brown (1) Count 1. (drb) (Entered: 03/21/2013) |
| 03/21/2013 | 21 | Letter to Clerk, Southern District of Florida re: Rule 20 transfer. (drb) (Entered: 03/21/2013) |

| PACER Service Center |||||
|---|---|---|---|---|
| **Transaction Receipt** |||||
| 03/29/2013 08:58:06 |||||
| **PACER Login:** | ud0633 | **Client Code:** | | |
| **Description:** | Docket Report | **Search Criteria:** | 3:12-cr-30221-MJR | |
| **Billable Pages:** | 3 | **Cost:** | 0.30 | |